IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-631-D

BARBARA LYNN MULTARI )
and FRANCO GIUSEPPE MULTARI, )
)
Plaintiffs, )
)
v. ) **ORDER**
)
RIADH FAKHOURY, )
)
Defendant. )

On November 2, 2023, Barbara Lynn Multari ("Barbara Multari") and Franco Giuseppe Multari ("Franco Multari") (collectively "the Multaris" or "plaintiffs") filed a pro se complaint against Riadh Fakhoury ("Fakhoury" or "defendant") [D.E. 1]. On January 11, 2024, the Multaris, through counsel, filed an amended complaint against Fakhoury and his wife [D.E. 8]. On March 1, 2024, Fakhoury and his wife moved to dismiss the amended complaint for lack of jurisdiction, failure to state a claim, and forum non conveniens [D.E. 19] and filed a memorandum in support [D.E. 20]. See Fed. R. Civ. P. 12(b)(2), (6).

On March 27, 2024, the Multaris filed a second amended complaint against Fakhoury and dismissed Fakhoury's wife from the action [D.E. 26]. The Multaris' second amended complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, fraud, negligent misrepresentation, negligence, gross negligence, and breach of fiduciary duty. See id. On April 10, 2024, Fakhoury moved to dismiss the second amended complaint for failure to state a claim and forum non conveniens [D.E. 27] and filed a memorandum in support [D.E. 28]. On May 1, 2024, the Multaris responded in opposition

[D.E. 29]. On May 15, 2024, Fakhoury replied [D.E. 30]. As explained below, the court denies as moot Fakhoury's first motion to dismiss, grants in part Fakhoury's second motion to dismiss, stays the action, and compels arbitration of the Multaris' claims.

I.

On July 19, 2021, the Multaris met Fakhoury, "who presented himself as an expert in private equity investing." 2d Am. Compl. [D.E. 26] ¶ 10. In August 2021, in a series of conference calls, Fakhoury tried to convince the Multaris to invest in private equity through Fakhoury's investment firm Vestech Partners, LLC ("Vestech"). See id. at ¶ 11. During those conference calls, Fakhoury made "a series of false claims," such as "claiming a[n] 85% success rate, returns in multiples of 4-10x conservatively, claiming to have unique knowledge on each investment opportunity and access to the best teams." Id. Fakhoury also "made no disclosure(s) of any risk for investment in KERV, DeNexus, Punja Global Fund, TrendiTech, Didja, AllSeated[,] and PointInside." Id. From September 2021 to November 2021, Fakhoury hosted a series of webinars for the Multaris and other prospective investors. See id. at ¶ 13. In these webinars, Fakhoury "repeated and expounded upon the false claims [Fakhoury] made to [the Multaris] in earlier conversations, regarding the performance of [Fakhoury] and Vestech." Id. Moreover, Fakhoury "stated in the webinar and in follow up verbal conversations . . . that he was the exclusive avenue for investment with AllSeated, PointInside[,] and Didja." Id. Thus, the Multaris "could only invest with AllSeated, PointInside[,] and Didja, if they utilized [Fakhoury's] services as offered through himself personally and president of Vestech." Id. The Multaris allege that Fakhoury made several other false claims during the webinar and other conversations regarding Fakhoury's investment performance and the Multaris' potential risk if they invested with him. See id. at ¶¶ 15–22.

2

On October 25, 2021, and November 3, 2021, based on Fakhoury's statements, the Multaris wired $1,428,000 to SouthState Bank of Winterhaven, Florida, to invest in Didja, PointInside, TrendiTech, and AllSeated and to pay management fees to Fakhoury. See id. at ¶ 23. Fakhoury created VP 215, LLC ("VP 215") as an investment vehicle for the Multaris to "funnel their investment funds through" and invest with Fakhoury. Id. at ¶ 12. To become investors in VP 215 (and, by extension, in Didja, PointInside, TrendiTech, and AllSeated), the Multaris entered an Equity Purchase Agreement and an Operating Agreement with VP 215. See id.; [D.E. 28-1] (Operating Agreement); [D.E. 28-2] (Equity Purchase Agreement). Fakhoury signed the Equity Purchase Agreement and Operating Agreement on behalf of VP 215 as VP 215's manager. See [D.E. 28-1] 37; [D.E. 28-2] 17. The Operating Agreement contains an arbitration provision that states, inter alia, "any dispute arising out of or relating to this Agreement shall be finally settled by binding arbitration conducted expeditiously in accordance with the J.A.M.S./Endispute Comprehensive Arbitration Rules and Procedures (the 'J.A.M.S. Rules')." [D.E. 28-1] 35.

From December 2021 to July 2022, Fakhoury presented additional investment opportunities to the Multaris. See 2d Am. Compl. ¶ 24. The Multaris allege that Fakhoury "intentionally portrayed false results exceeding expectations and falsely projected significant returns for TrendiTech and Didja." Id. Based on Fakhoury's statements, the Multaris invested another $674,000 in KERV, DeNexus, Punja Global Fund, Didja, and TrendiTech. See id. The Multaris allege that Fakhoury failed to do the necessary research to substantiate his investment performance claims about the companies the Multaris invested in. See id. at ¶¶ 26–27.

In November 2022, PointInside "failed as a company." Id. at ¶ 28. In February 2023, the Multaris learned of PointInside's failure. See id. The Multaris completely lost their investment in PointInside. Id.

3

On May 2, 2023, Fakhoury asked the Multaris for additional funding for Didja. See id. at ¶ 29. Fakhoury "claim[ed] Didja had changed from projected 10x returns approximately 60 days prior, to immediate need for additional funding." Id. The Multaris learned that Didja was "considering an assignment to creditors and bankruptcy which will likely lead to the complete loss of [the Multaris'] capital in Didja." Id. The Multaris allege that Fakhoury's "statement that Didja was to yield a 10x return was intentionally false because" Fakhoury "knew when he made the statement that Didja was in dire financial straits and on the brink of collapse." Id. On September 6, 2023, Fakhoury told the Multaris that TrendiTech also was entering receivership. See id. at ¶ 31. The Multaris allege that TrendiTech's receivership "will most likely lead to the complete loss of" their investment in TrendiTech. See id.

On November 5, 2023, based on Fakhoury's statement "that the money [the Multaris] invested could at any time be returned without consequence," the Multaris asked Fakhoury to return their investments in KERV, AllSeated, DeNexus, and Punja Global Fund. Id. at ¶ 32. On November 9, 2023, Fakhoury "responded that those funds could not be returned despite the fact that the companies for which those funds were invested are currently not failing or in distress." Id. The Multaris allege that "[t]hroughout 2022 and early 2023 [Fakhoury] gave positive reports on the performance of those companies, such that the return of [the Multaris'] funds should not be prevented and it is solely [Fakhoury] that is improperly withholding [the Multaris'] funds." Id.

II.

Fakhoury contends that "[t]he parties agreed to mandatory arbitration of this dispute and any threshold dispute over arbitrability." [D.E. 27] 1; see [D.E. 28] 7–10; [D.E. 30] 1–6. The standard for deciding a motion to compel arbitration brought under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, is similar to the standard applicable to a motion for summary judgment.

4

See, e.g., Naimoli v. Pro-Football, Inc., ___ F. Supp. 3d ___, 2023 WL 5985256, at *4–5 (D. Md. Sept. 14, 2023), appeal filed, No. 23-2020 (4th Cir. Oct. 2, 2023). The FAA provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; see Amos v. Amazon Logistics, Inc., 74 F.4th 591, 595 (4th Cir. 2023). To compel arbitration, the movant must show: "(1) a dispute exists between the parties; (2) the dispute falls within the scope of a written, valid agreement that includes an arbitration provision; (3) the parties' agreement relates to interstate or foreign commerce; and (4) the opposing party has failed or refused to arbitrate the dispute at hand." Amos, 74 F.4th at 595; see Adkins v. Lab. Ready, Inc., 303 F.3d 496, 500–01 (4th Cir. 2002). "[G]eneral state-law principles of contract interpretation" govern "the interpretation of an arbitration agreement within the scope of the" Federal Arbitration Act, but this court also must give "due regard . . . to the federal policy favoring arbitration" and resolve "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 475–76 (1989); see Wachovia Bank, Nat'l Ass'n v. Schmidt, 445 F.3d 762, 767 (4th Cir. 2006).

The Multaris argue that Fakhoury cannot compel arbitration because Fakhoury is not a party to the Operating Agreement, the Multaris' claims are based on conduct that predates the Agreements, and the Multaris' claims against Fakhoury are made in his individual capacity and capacity as president of Vestech. See [D.E. 29] 3–9. Fakhoury responds that the Multaris' arguments do not preclude arbitration of their claims against him. See [D.E. 30] 1–6.

The parties agree that North Carolina law and Fourth Circuit law govern the Agreements. See [D.E. 28] 7–10; [D.E. 29] 3–9; [D.E. 30] 1–6. Generally, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to

5

submit." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960). Under North Carolina law, "a nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate." Erichsen v. RBC Cap. Mkts., LLC, 883 F. Supp. 2d 562, 571 (E.D.N.C. 2012) (quotation omitted); see GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC, 590 U.S. 432, 437 (2020); Rogers v. Tug Hill Operating, LLC, 76 F.4th 279, 285–88 (4th Cir. 2023); Am. Bankers Ins. Grp., Inc. v. Long, 453 F.3d 623, 627 (4th Cir. 2006); Klopfer v. Queens Gap Mountain, LLC, 816 F. Supp. 2d 281, 292 (W.D.N.C. 2011); Collie v. Wehr Dissolution Corp., 345 F. Supp. 2d 555, 561–62 (M.D.N.C. 2004); Ellison v. Alexander, 207 N.C. App. 401, 411–12, 700 S.E.2d 102, 110–11 (2010); Ellen v. A.C. Schultes of Md., Inc., 172 N.C. App. 317, 320, 615 S.E.2d 729, 732 (2005); Brown v. Centex Homes, 171 N.C. App. 741, 745–46, 615 S.E.2d 86, 88–89 (2005).

Equitable estoppel allows a nonsignatory to compel arbitration in two circumstances: (1) the signatory relies "on the terms of the written agreement in asserting its claims against the nonsignatory"; or (2) the signatory "raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." Brantley v. Republic Mortg. Ins. Co., 424 F.3d 392, 395–96 (4th Cir. 2005) (cleaned up). A nonsignatory can also compel arbitration against a signatory under "[w]ell-established common law principles" of agency or contract. Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 416–17 (4th Cir. 2000); see GE Energy, 590 U.S. at 437 ("[A]rbitration agreements may be enforced by nonsignatories through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver[,] and estoppel."

(quotations omitted)); Long v. Silver, 248 F.3d 309, 320 (4th Cir. 2001); Ellison, 207 N.C. App. at 412–13, 700 S.E.2d at 110–11.

Fakhoury signed the Operating Agreement on behalf of VP 215 as VP 215's manager. See [D.E. 28-1] 37. The Multaris argue that they do not assert their claims against VP 215 or Fakhoury in his capacity as VP 215's manager. See [D.E. 29] 3–9. Instead, they assert their claims against Fakhoury in his capacity as Vestech's President. See id.; see also 2d Am. Compl. ¶ 12 ("None of [Fakhoury's] fraudulent statements and representations were done in his capacity as manager of VP 215, LLC.").

The court rejects the Multaris' distinction. The Multaris allege that Fakhoury, as President of Vestech, "engaged in a pre-meditated scheme to defraud" the Multaris by inducing the Multaris to make "investment decisions based on [Fakhoury's] fraudulent claims." 2d Am. Compl. ¶ 1. Fakhoury's alleged fraudulent statements concerned Vestech's investment success rate and "investment in KERV, DeNexus, Punja Global Fund, TrendiTech, Didja, AllSeated[,] and PointInside." Id. at ¶ 11; see id. at ¶¶ 12–34. The Multaris allege that Fakhoury told the Multaris they "could only invest with AllSeated, PointInside and Didja, if they utilized [Fakhoury]'s services as offered through himself personally and president of Vestech" because "he was the exclusive avenue for investment" with those companies. Id. at ¶ 13. VP 215, in turn, was the vehicle through which the Multaris invested in most of those companies with Fakhoury. See id. at ¶ 12; [D.E. 28-1] 1–2. In other words, VP 215 was an investment product that Fakhoury managed and "offered through himself personally and [as] president of Vestech." 2d Am. Compl. ¶ 13. Accordingly, Fakhoury can enforce the arbitration provision in the Operating Agreement. See, e.g., Ellison, 207 N.C. App. at 412–13, 700 S.E.2d at 110–11.

Fakhoury argues that under the Operating Agreement, the parties agreed to arbitrate arbitrability. See [D.E. 28] 7–10. "Courts should not assume that the parties agreed to arbitrate arbitrability . . . ." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Parties, however, can agree to arbitrate arbitrability if they "clearly and unmistakably provide that the arbitrator shall determine what disputes the parties agreed to arbitrate." Peabody Holding Co. v. United Mine Workers of Am., Int'l Union, 665 F.3d 96, 102 (4th Cir. 2012) (quotations omitted); see AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986); Carson v. Giant Food, Inc., 175 F.3d 325, 329 (4th Cir. 1999). Broad arbitration clauses alone do not suffice. See Peabody Holding Co., 665 F.3d at 102; Hetrick Cos. v. IINK Corp., ___ F. Supp. 3d ___, 2024 WL 47408, at *9 (E.D. Va. Jan. 3, 2024). "Those who wish to let an arbitrator decide which issues are arbitrable need only state that 'all disputes concerning the arbitrability of particular disputes under this contract are hereby committed to arbitration,' or words to that clear effect." Carson, 175 F.3d at 330–31. Additionally, incorporating the AAA or JAMS rules "constitutes evidence that the parties delegated arbitrability questions to the arbitrator." Devine v. Bethesda Softworks, LLC, 636 F. Supp. 3d 564, 572–73 (D. Md. 2022); see Simply Wireless, Inc. v. T-Mobile US, Inc., 877 F.3d 522, 527–28 (4th Cir. 2017), abrogated on other grounds by Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63 (2019).

Under the Operating Agreement, the parties agreed to arbitrate "any dispute arising out of or relating to this Agreement . . . in accordance with the J.A.M.S./Endispute Comprehensive Arbitration Rules and Procedures (the 'J.A.M.S. Rules')." [D.E. 28-1] 35. In Simply Wireless, the Fourth Circuit held that a materially indistinguishable arbitration provision referred arbitrability disputes to the arbitrator principally because of the arbitration provision's incorporation of the JAMS rules. See Simply Wireless, Inc., 877 F.3d at 526–28. Under Simply

8

Wireless, all parties to an agreement must be sophisticated. See, e.g., Stone v. Wells Fargo Bank, N.A., 361 F. Supp. 3d 539, 552–55 (D. Md. 2019). Here, the Multaris warranted that they were "accredited investors" under federal securities laws. See [D.E. 28-2] 5. Additionally, the Multaris warranted that they had "substantial experience in evaluating and investing in private placement transactions of securities" and were "capable of evaluating the merits and risks of [their] investment in [VP 215] and ha[d] the capacity to protect [their] own interests." Id. Accordingly, the Multaris are sophisticated parties. See, e.g., Dedrick v. Valuable Techs., Inc., No. 22CV4341, 2023 WL 8802820, at *6 (D.N.J. Dec. 20, 2023) (unpublished) (referring to a plaintiff whose "accredited investor" status was in dispute as a "sophisticated part[y]"); Bancroft Life & Cas. ICC, Ltd. v. FFD Res. III, LLC, Civ. No. 11-2382, 2012 WL 2368302, at *4 (S.D. Tex. June 21, 2012) (unpublished); In re Enron Corp. Sec., Derivative & ERISA Litig., 761 F. Supp. 2d 504, 533 n.21 (S.D. Tex. 2011) ("[T]he concept of the accredited investor is intended to encompass those persons whose financial sophistication and ability to sustain the risk of loss of investment or ability to fend for themselves render the protections of the Security Act's registration process unnecessary." (quotation omitted)); Addy v. Piedmonte, Civ. No. 3571-VCP, 2009 WL 707641, at *20 (Del. Ch. Mar. 18, 2009) (unpublished) (holding "there are two or more sophisticated parties" to a contract where one of the parties represented "that he is a sophisticated and accredited investor"). Thus, the Multaris and Fakhoury referred arbitrability issues to an arbitrator. See, e.g., Simply Wireless, Inc., 877 F.3d at 526–28.

"[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." Henry Schein, Inc., 586 U.S. at 69; see, e.g., Galloway v. Priority Imps. Richmond, LLC, No. 20-1020, 2023 WL 1858387, at *1–2 (4th Cir. Feb. 9, 2023) (per curiam) (unpublished); Ayers v. Markiewicz, No. 5:23-CV-442, 2024 WL

9

2126660, at *6 (E.D.N.C. May 9, 2024) (unpublished), appeal filed, No. 24-1541 (4th Cir. June 12, 2024). This principle applies even "if the argument for arbitration is wholly groundless." Henry Schein, Inc., 586 U.S. at 70. Thus, the court's only role at this stage is to decide if the parties agreed to arbitrate the issue. See, e.g., Rogers, 76 F.4th at 286; Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC, 993 F.3d 253, 257–58 (4th Cir. 2021).

The Multaris do not challenge the validity of the Operating Agreement or of the arbitration provision.[1] Instead, the Multaris argue that Fakhoury's alleged conduct that gave rise to their claims predated the Operating Agreement. See [D.E. 29] 8–9. Thus, according to the Multaris, the arbitration provision does not apply to their claims. See id. This is a repackaged arbitrability argument that the Multaris may present to the arbitrator. Accordingly, the court orders arbitration.

Finally, Fakhoury asks the court to dismiss the Multaris' claims under the FAA. See [D.E. 27] 1; [D.E. 28] 10. Under 9 U.S.C. § 3, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had." 9 U.S.C. § 3. This "court does not have discretion to dismiss the suit on the basis that all claims are subject to arbitration." Smith v. Spizzirri, 144 S. Ct. 1173, 1176 (2024). Thus, "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." Id. at 1178. Accordingly, the court grants in part Fakhoury's motion, stays this action, and compels the Multaris to arbitrate their claims.

---

[1] The Multaris state they "were fraudulently induced into" the Equity Purchase Agreement and Operating Agreement. 2d Am. Compl. ¶ 12. They do not, however, assert a claim for fraudulent inducement in their second amended complaint or take anything more than "a passing shot at the issue" in their response brief. United States v. Fernandez Sanchez, 46 F.4th 211, 219 (4th Cir. 2022) (quotations omitted); cf. [D.E. 29] 20 n.4.

10

## III.

In sum, the court DENIES AS MOOT defendant's first motion to dismiss [D.E. 19], GRANTS IN PART defendant's second motion to dismiss [D.E. 27], STAYS the action, and ORDERS plaintiffs to arbitrate their claims.

SO ORDERED. This 24 day of June, 2024.

JAMES C. DEVER III
United States District Judge